Good morning, Your Honor. Marilyn Bednarski and I'm here on behalf of Mr. Washington. With all of the attorneys here, I can tell you how we'll divide our time. I'll take five minutes. You've got the clock in front of you, so you can do whatever you want. Your Honor, this is a case involving strictly a sentencing issue as to Mr. Washington. The government is agreeing to a limited remand under Ameline. This is a case that started out really largely as a legal dispute. I think all the briefing was done by last Thanksgiving. There was an order that came out from a court, I think urging counsel not to file any supplemental briefings. So now pursuant to the recent Ameline decision in June and also Moreno-Hernandez, we would argue that it's appropriate for a limited remand. So the government is agreeing in this case that a limited remand applies. So we don't have anything else to talk about on this case. That's correct. What's the effect of that? This is where there's a post-plea agreement or something? It's unclear, isn't it? Because it wasn't adopted by the district court. Was it before the district court? Well, it was filed as part of the record. The court never acknowledged it. It was never adopted. I mean, under Rule 11, there are provisions where the court incorporates things. They're most typically done as plea agreements prior to a plea. And then they're incorporated on the record generally during a plea colloquy. There was no way to know whether the court even read it. What would be the purpose of doing a post-plea agreement? Would it be for sentencing purposes or? Well, I think it was largely I was trial counsel appointed prior to sentencing and after the plea. The lawyer who was there at the time of the plea was relieved. Ms. Kim, who's here today for the government, was the lawyer there for the government sentencing. So it was really a discussion between counsel. It's unclear to me if the district court ever read it. It was filed as part of the clerk's record. Was it entered? Were you an attorney when it was entered? Yes. It says it was entered in an agreement to settling so that you wouldn't move to reopen the plea or something. It was a very odd sort of procedural background. Mr. Washington had pled guilty after the selection of the jury on the third day of trial. And there was this colloquy with the court at the time of the plea where it was really clear that he had been very dissatisfied with his trial lawyer and the amount of time that the lawyer had to prepare and with the level of preparation. So there was a real issue as to whether or not he would withdraw his plea. So from the government's point of view, I would think they were interested in that, you know, the plea sticking. He pled straight up to all three counts with no plea agreement at the time. I see. Okay. Thank you. Thank you very much. Who's next? Good morning, Your Honor. Philip Bronson for Coran Allen, defendant. I would like to address the issue of what I would call the issue of the Sixth Amendment and hearsay. During the trial, a government agent, Tackley Attori, testified that during his interrogation of co-defendant O'Neill that O'Neill said that Washington had told him that he had recruited, among others, Coran Allen, like my client. There was a hearsay objection. Washington never testified, and O'Neill was subject to cross-examination. There was a hearsay objection. There was not a constitutional objection. It was not, but I believe this would still be – could be reviewed for plain error. Right. It has to be reviewed for plain error. But the Sixth Amendment issue could be reviewed for plain error because it seems to me that we do have error that's plain, that there was a hearsay violation, and that we do have a substantial violation of – Well, this was – this was the statement by O'Neill. I mean, this was testimony by – O'Neill. No. This was testimony by the – by the officer, right, Tackley Attori? This was testimony by Officer Tackley Attori as to what O'Neill – What O'Neill told him. About what Washington had told him. About what Washington – Double hearsay. Okay. So O'Neill was – had testified. O'Neill testified, and Washington never testified. And it was admitted as a prior consistent statement of the declarant who's – of a witness whose testimony has been called into question. Right. So what is the hearsay objection there? Well – I mean, you might have a Sixth Amendment question. What exactly is – why is that exactly what the hearsay rule contemplates 801? Well, it seems to me there's double hearsay. Washington's statement to O'Neill as to what he did is hearsay. And then O'Neill's statement to Tackley Attori of what O'Neill – of what Washington told him was also hearsay. It's just – it seems to me we have a pretty straightforward hearsay issue. And the issue that we raise is that this involves a Sixth Amendment. You don't answer my question. Why isn't it covered by 801, by exception, that this is not hearsay because it's a prior consistent statement? I – well, we concede that that would be – that would be covered. Okay. As to O'Neill. As to O'Neill. But it certainly wouldn't be covered as to Washington. Why isn't Washington a party opponent? Well, Washington never testified. It doesn't matter. 801 says either a party opponent or a declarant. I mean, they're different. Look at 801. You got 801? I don't have – I'm familiar with it, but I don't have it. It's always a good thing to try to be familiar with applicable rule. Okay. So you've got – Tagliatore is testifying. So his statements are not hearsay. He is testifying about something that O'Neill said to him. Okay. So that's an out-of-court statement. But that is an out-of-court statement by somebody who has testified who is a declarant and whose veracity has been cast into doubt. But Washington's statement to – I haven't gotten there yet. We're just talking about O'Neill's statement. Okay. So O'Neill's statement is covered by the exception. And then Washington's statement to O'Neill is covered by another exception to the hearsay rule, which is 801, the exception for the statements of a party opponent. The government introducing is the party. Washington is the party opponent. And admission. Well, our argument was that this hearsay rule would be subordinate to the defendant's Sixth Amendment right of confrontation under Crawford. Well, Crawford and Bluton, right? Because Washington's statement is being used against Allen. Right. And who was he denied confrontation with? He was denied confrontation as to Washington because Washington didn't testify. But Washington – presumably Washington's original statement was a statement of a co-conspirator made in further instance of conspiracy, wasn't it? I will bring friends to you. Yes, but our argument is that under Crawford, these are technical hearsay exceptions that give way to defendant's right to cross-examine a – cross-examine a declarant. Well, doesn't Bluton and Crawford say that that doesn't apply to – I mean, remember, Bluton was a precursor to Crawford. And doesn't that specifically accept situations where there is a statement in further instance of conspiracy? As I – as I read Crawford, if the exception violates the right – if the declarant makes a testimonial statement, it's a violation of the Sixth Amendment. Whether or not there's an exception, a hearsay exception, whether there's a statutory hearsay exception, and that constitutes the violation under Crawford. And that was the basis of our argument, that even if there was a conspiracy exception, Washington's statement, if it is testimonial, would violate his Sixth Amendment confiscation rights. And I would like to reserve whatever time is remaining. Okay. You would still have – even if you succeeded in an argument, you would still have a harmless error hurdle to jump over, because this is – Crawford is subject to harmless error analysis, isn't it? Yes, it would be. That's a hard one for you. Well, yes, it is. It is a hard one. I've argued the issue of prejudice in the opening brief. He was – wasn't identified inside the bank and other factors to try and establish prejudice. Okay. Thank you. Anybody want to speak for Mr. Hughes? Oh, I see. Hughes is – that's right. Okay. Okay. Yes, I remember. So we'll hear from the government then. May it please the Court, Dorothy Kim and Jason DeBrettville on behalf of Appellee and Appellant to the United States. Your Honors, I would like to discuss this morning the conviction issues raised in Defendant Coran Allen's appeal, and Mr. DeBrettville will address the sentencing issue in the government's appeal. And as Ms. Spodnarski stated, we do concede that with respect to Defendant Coran Allen's sentencing appeal and Defendant Larry Washington's sentencing appeal, we do concede that that should be remanded in light of this Circuit's recent decision in Moreno-Hernandez. Your Honors, Defendant Allen's conviction following trial should be affirmed because none of the defendant's claimed errors supports reversal in this case. If I can first address the Sixth Amendment issue that was raised by counsel. Your Honors, Defendant raises an appeal to two separate statements. The first was – I'm sorry – co-conspirator O'Neill's testimony that Washington had told him he would recruit others for the bank robbery. The second statement is following co-conspirator O'Neill's testimony, Special Agent Peter Tagliaredi testified that O'Neill had previously told him Washington stated he would recruit others. Your Honors, because defense did not object to that first statement at all and objected only on hearsay grounds to the second statement, that Special Agent Tagliaredi statement, this Court should review for plain error only. There was no plain error here. Now, although there is no Ninth Circuit decision or published decision on point, the other circuits that have considered this issue has concluded that co-conspirator statements made in furtherance of the conspiracy during the course of the conspiracy are not testimonial in nature and, therefore, are not barred by the Crawford opinion. And, yes, Your Honor, the government admitted co-defendant Washington's statements pursuant to the hearsay exception in 801b2e. Even assuming that the defendant had preserved his appellate rights, this Court would still review for harmless error, and the government submits for the reasons in its brief that there was no harmless error beyond a reasonable doubt. Your Honors, now I'd like to move on to, unless there are any questions, the defendant's 924c conviction. Your Honors, there was, in this case, the defendant was convicted of 924c under a Pinkerton theory of liability. The defendant does not dispute that the guns were carried and used during the robbery, and the evidence at trial demonstrated, in fact, that there were two robbers who went in with guns and at least one of the robbers struck one of the two tellers with the gun. And, therefore, the only issue is whether it was reasonably foreseeable to this defendant that the guns would be used or carried. Your Honors, there was evidence that it was reasonably foreseeable to this defendant because he participated in an early morning meeting during which one of the robbers, Hughes, displayed his gun, and another of the robbers, Washington, held out a bag of guns. In addition, given the nature of this bank robbery, which was a takeover bank robbery involving numerous participants who went into the bank to overcome the will of the tellers and the other people at the bank, given the very nature of this bank robbery, it must have been reasonably foreseeable to Defendant Allen that guns would be used. Unless the Court has any questions. Okay. We'll hear from Mr. DeBretto. Yes, Your Honor. Good morning, Ma'am. This is Court. Jason DeBretto appearing on behalf of the United   The court in this case proposed a sentence that was 10 years, more than 10 years, below the applicable guideline range. It did so not because it considered this deviation or departure necessary.  Yes, in Hughes, Your Honor. Was there a post-plea agreement in Hughes as it was in Washington? No, Your Honor. There was not? No. And so this Court in sentencing was free from any recommendations pursuant to a plea agreement. However, what the Court did do is it sentenced Defendant to 10 years below or more than 10 years below the applicable range, not because it felt that that deviation was necessary or just, but because it made a legal error. And the Government asked this Court to remand Mr. Hughes for resentencing to allow the Court to consider the correct guideline range pursuant to the remedial holding in Booker. Now, the Defendant. Counsel. Counsel, did the district court apply any enhancements, the victim injury and loss enhancements to Mr. Hughes' sentence? Your Honor, it's very complicated to follow, but in the end, I believe that the district court did apply some enhancements. It did not apply the bodily injury enhancement because that was not charged nor was it agreed to by the Defendant. The Court, I do believe, did in fact apply the bank or financial institution victim enhancement, which is a two-level enhancement. And how about the amount of loss? I believe the Court disregarded the amount of loss. And it's worth noting that at the change of plea, Defendant specifically agreed to both the fact that the loss was in excess of $20,000 and when asked what sort of sentence he believed he was facing, responded by saying, well, Your Honor, I am a career offender. So even if for some reason the Court were to resent or was going to abide by some post-plaintiff regime and only apply factors that were admitted or agreed to by Defendant, the Court should have and could have sentenced Defendant as a career offender and taken into account the loss amount. The loss amount was actually in the indictment, wasn't it? Yes. It was also in the indictment, Your Honor. But again, during... And he was pleaded. Yes, Your Honor. And even if that were not true, at the change of plea call... That's the end of that. That was the government's position of sentencing, Your Honor. The Defendant here opposes the government's request for remand, stating that if the court on remand imposes a sentence that could not realistically have been imagined at the time of the offense, such a sentence might implicate Defendant's ex post facto and due process rights. That claim, the government submits, is unfounded and more importantly, it's unlikely because we don't know now what the Court will do. And again, the government at resentencing will ask the Court to impose a guideline sentence. So there's no reason on this record to believe that the district court on remand will impose a higher sentence. Okay. Thank you. Thank you, Your Honor. Good afternoon. May it please the Court. Kia Kato on behalf of Jerry Lewis Hughes. The issue with respect to Mr. Hughes's sentence is one of due process. When we appeared before the district court for sentencing on October of 2004, we asked the Court to apply the law as it existed. And that is what the Court did. As we all know, three months later, January 12, 2005, everything changed. And pursuant to the remedial portion of the Booker opinion, the sentencing guidelines, which were previously binding, which were previously mandatory, were now simply advisory. There was a complete alteration of federal sentencing law as we previously knew it. And that alteration was traumatic. It was unforeseen. And it was indefensible with respect to the law as it existed at the time in which the offense was committed. I don't know. The time the offense was permitted, the maximum sentence on the statute was still the same, right? Well, Your Honor, pursuant to the ---- You're going to answer my question, aren't you?  No. We would submit that no, that the statutory maximum at the time the offense was committed was limited to the facts which were proven beyond a reasonable doubt. The statutory maximum? Correct. Pursuant to ---- Does the statute provide a different maximum than it does now? The statute pursuant to the U.S. Code, You're correct, Your Honor. It does have the same ---- You're going to mince words with me. You're not going to get very far. Okay? The statutory maximum was the same as it is today. Pursuant to the Code, yes, the statutory maximum was the same. As opposed to what? As opposed to what the Court ruled in Apprendi. The statutory maximum. And in ---- Maximum in the statute. Correct. Okay. Do you have any doubt as to what I mean? Yes. You're saying? That's correct, Your Honor. Okay. And you were, at the time you committed the offense, there was a sentencing scheme in place that allowed departures based upon all sorts of factors having to do with the victim and amount of ---- for the judge to set the sentencing based upon his own findings as to various facts that affected your client, right? Correct. Okay. That's what was the situation at the time your client committed his offense. Correct. A lot of stuff happened in between, which is of no particular consequence because it didn't affect notice to your client at the time he affected, he committed the offense. And the bottom line is we're back in a situation where the statutory maximum is what it is, and this judge can, based on his own findings, enhance the sentence, increase the sentence. So I don't see where your client has been prejudiced or where there's a denial of due process, or how you could possibly claim any, any, any, any detriment, any justifiable, unjustifiable detriment to your client. Your Honor, it's our position that there was a ---- there would be a violation of due process if this case were remanded to allow the court to essentially sentence Mr. Hughes to a maximum sentence which would, which will be beyond that which was admitted or proven beyond a reasonable doubt. Why? Why? Because when the rule was announced in Booker, the Breyer opinion ---- But what happened in Booker was after your, you know, to determine due process, we look at the situation as it happened when your client committed the offense. And we imagine, contrary to fact, but we imagine that your client knew exactly the state of the law on that day. And if he did know the state of the law on the day he committed his offense, he would have known very well that he could get a maximum statutory sentence of 20 years or 30 years or whatever the statutory maximum sentence is, and that there were guidelines in place, but the guidelines vary depending on findings to be made by the, by the judge. That is exactly the way it is today, except for the fact that the judge is no longer, you know, it's just a little better for your client because the judge doesn't have to go up if he chooses not to. He can make the findings and still say, well, I don't feel like going up that far. So it's a little better, certainly no worse than it was on the day he committed the offense. And sure, there was a lot of stuff in between, and if the wheel had stopped somewhere along the way, your client might have been better off. But I don't see why he could claim as a matter of due process entitlement to any of those in-between changes. Your Honor, I think, I think this is where the two different opinions in Booker are significant, and our position would be that the Stevens majority opinion should be applied to Mr. Hughes because it's a new rule which benefits him, and therefore, pursuant to Griffith, because it's a new rule which benefits the appellant, it should apply to his case while on direct appeal. In contrast, the Breyer opinion is actually a rule which works to the detriment of Mr. Hughes in this case, and pursuant to the due process clause, that is a situation where it cannot be applied retroactively to his detriment. In this case specifically, what it would do is it would significantly, dramatically increase the maximum punishment that the court could impose, and in his case ---- But it's still no more than the punishment he would get than if he was sentenced according to the scheme that was applicable on the day he committed his crime. I mean, let's say the day he commits his crime, you have an instant trial and instant sentencing, right? He would be in no worse a position than he would be for a man that let the state judge take his case into account. So I can't see how he could possibly claim the benefit of this intervening rule that ---- Well, actually, Your Honor, and this is exactly what this Court ---- I mean, what you really are claiming for your client is a windfall. What you're claiming, you know, for a while the law was better, and therefore he gets the benefit of, you know, the best situation that happened between the time he committed his offense and the time he gets sentenced. That's not the law. Your Honor, what we're actually ---- our position is that the government cannot use the new reasoning and procedure in place under the remedial portion of Booker to the detriment of Mr. Hughes. Why not? Because as stated in Bowie, and if you look at the cases which have interpreted Bowie, when a judicial construction of a statute works retroactively to the detriment of an individual, there is a violation of due process. And that's exactly what we have here. The government, if we have ---- But you're using the term too imprecisely, detriment, you know, retroactively to a detriment of an individual. It is not retroactive to the point where things are worse than they were on the day he committed the offense. It just so happened that things got better for a while, while your client was awaiting final sentencing, and too bad, it slipped back. This is not a retroactivity question because things are going to be no worse for him than they were on the day. I mean, that's really the only day you can peg. You can say, look, there's a due process right. He was aware of the law. He committed this crime, counting on the state of the law as it was. You can't go back and apply a new rule to him that would make things much worse for him. That would be ex post facto. That would be a denial of due process. But he's not going to be any worse off than if he had been sentenced on the day according to the scheme that was enforced on the day he was committed the offense. Your Honor, he was actually sentenced according to the scheme that was in place on the day in which he was sentenced, October 2004 in this case. And we know what that sentence was. But the judge mistakenly did not believe he could give him enhancements based on these other factors, which we now know incorrectly. The judge was incorrect in saying he couldn't find him. We now know that he can. Well, we would submit that under the Stevens portion of the Booker opinion that the judge was correct in interpreting the law at that time such that he could not apply enhancements such as the career offender enhancement. Counsel, are you aware that other circuits have ruled the other way on that issue? I am, Your Honor. And we would obviously ask that this Court take a position contrary to those circuits. And I do believe that it's consistent. Do you want us to follow the circuits that have gone your way? Your Honor. Are there any? I must confess I'm not aware of any that have. You want us to take a leadership role. Exactly. Which this circuit always does. But I would just close by saying that. I see the government voice is nodding as well. That this is a case where Mr. Hughes will be facing a significantly different sentence than the one that was imposed back when the Court sentenced him. And the only way that we get there is by allowing the retroactive application of a judicial of a statute that was construed in a way that nobody could have predicted and nobody could have defended at the time in which Mr. Hughes was committed the offense. And that is precisely under BUI what the due process clause should protect defendants  Thank you. Thank you. You've eaten up most of the time, in fact, all the time. Do either counsel on that side wish to add anything? No, thank you. I think the government has rebuttal time. They do. They want to take it. Can I move this amendment this time, unless you have any questions? Thank you. The case is just arguable. The case is just arguable. It stands submitted. We are adjourned.
judges: Canby, Kozinski, Rawlinson